Albert Joseph MELANCON, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–98–00204–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 21, 2001.

Rehearing Overruled Feb. 21, 2002.

Ronnie G. Harrison, Houston, for appellants.

Alan Curry, Houston, for appellees.

EN BANC court consists of Justices YATES, ANDERSON, HUDSON, FOWLER, EDELMAN, FROST, MURPHY,* AMIDEI,** WITTIG,*** and BAIRD.†

## MAJORITY OPINION
## ON REHEARING
## EN BANC.

RICHARD H. EDELMAN, Justice.

The State's motion for rehearing en banc is granted, the majority and dissenting opinions issued in this case on September 21, 2000, are withdrawn, and the

* Senior Chief Justice Paul C. Murphy sitting by assignment.

** Former Justice Maurice E. Amidei sitting by assignment.

*** Senior Justice Don Wittig sitting by assignment.

† Former Justice Charles F. Baird sitting by assignment.

following majority, concurring and dissenting, and dissenting opinions are issued in their place.

Albert Joseph Melancon appeals his conviction for aggravated robbery[1] on the grounds that: (1) he was denied effective assistance of counsel; and (2) the trial court erred in (a) failing to sustain appellant's objections or grant a mistrial with regard to the prosecutor's closing arguments; and (b) its efforts to break the jury deadlock. We affirm.

### Ineffective Assistance

The first four of appellant's nine points of error contend that he received ineffective assistance of counsel because his trial counsel failed to: (1) subpoena an available alibi witness; (2) investigate the identity and availability of other witnesses who could corroborate appellant's alibi; and (3) question other available witnesses who could possibly support appellant's misidentification defense.

To prevail on a claim of ineffective assistance of counsel, an appellant must show, first, that counsel's performance was deficient, *i.e.*, it fell below an objective standard of reasonableness, and, second, that the appellant was prejudiced in that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim.App.2000). To be sustained, an allegation of ineffective assistance of counsel must be firmly founded and affirmatively demonstrated in the record. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim. App.1996). In reviewing an ineffectiveness claim, a court need not determine whether counsel's performance was deficient if it is easier to dispose of the challenge based on lack of prejudice. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

A defendant is not entitled to perfect or errorless counsel. *McFarland v. State*, 845 S.W.2d 824, 843 (Tex.Crim. App.1992). Moreover, in reviewing ineffectiveness claims, scrutiny of counsel's performance must be highly deferential. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Tong*, 25 S.W.3d at 712. A court must indulge, and a defendant must overcome, a strong presumption that the challenged action might be considered sound trial strategy under the circumstances. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Tong*, 25 S.W.3d at 712. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.[2]

A motion for new trial is a prerequisite to presenting a point of error on appeal where it is necessary to adduce facts not in the record. Tex.R.App. P. 21.2. A trial court's ruling denying a defendant's motion for new trial is reviewed for abuse of discretion. *Salazar v. State*, 38 S.W.3d 141, 148 (Tex.Crim.App.2001).[3]

---

**1.** Appellant was convicted by a jury and sentenced by the trial court to ten years confinement.

**2.** Thus, the presumption that an attorney's actions were sound trial strategy ordinarily cannot be overcome absent evidence in the record of the attorney's reasons for his con-

duct. *Busby v. State*, 990 S.W.2d 263, 268–69 (Tex.Crim.App.1999).

**3.** Although appellant does not frame them as such, his points of error asserting ineffective assistance of counsel are, in effect, a challenge to the denial of his motion for new trial because the new trial proceeding is where the issue was presented to and ruled upon by the

### Failure to Subpoena Witness

During trial, appellant presented evidence of the defenses of alibi and misidentification through a single witness, appellant's girlfriend, Ava Germany. Appellant claims his trial counsel was ineffective in failing to also subpoena Rita Hearn [4] to corroborate Germany's alibi testimony.

According to the testimony of appellant's trial counsel at the motion for new trial hearing (the "hearing"), Hearn had agreed to testify on appellant's behalf when trial counsel spoke with her the weekend before trial. At the time, counsel saw no reason to subpoena Hearn because, both times they spoke, she told him "very emphatically" that she would be at trial. To overcome any transportation obstacles, trial counsel arranged a taxicab to transport Hearn, Germany, and appellant's mother to a location near counsel's home from which counsel planned to drive them to the trial court. However, when the cab arrived at the designated location, Hearn was not in it. Despite considering her an important witness and being told that she was working at a restaurant that day, counsel made no further attempt to secure her presence at trial or to request a continuance because of her absence.

▬▬▬▬▬ Granting appellant a new trial for trial counsel's failure to subpoena Hearn would be justified, if at all, only if it were shown that Hearn's testimony, *i.e.*, if given at a new trial, could indeed be helpful to appellant.[5] However, despite contending that Hearn was so important a witness that the failure to subpoena her at trial was ineffective assistance, appellant presented no affidavit from Hearn with his motion for new trial and offered no testimony from her at the hearing or otherwise. Instead, evidence of the content of the testimony Hearn could purportedly have provided was limited to defense counsel's conclusory testimony at the hearing that "Miss Hearn, to a certain extent, corroborated Ava Germany's testimony." Although defense counsel also testified in the abstract at the hearing that he believed Hearn's testimony would have helped the defense and that she was an important witness, he did not state, and the record of the hearing does not otherwise contain, *a single fact* to which Hearn could testify about the events in question (or even showing that Hearn was ever in a position to possess any relevant knowledge).[6]

trial court and because appellant otherwise lacked a sufficient record to present that challenge for the first time on appeal.

4. Hearn is referred to as both Rita and Rhoda Hearn in the trial record and as Rita Hearn in the briefs before us.

5. *See Butler v. State,* 716 S.W.2d 48, 55 (Tex. Crim.App.1986) ("Counsel's failure to call such witnesses would be 'irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony.' "). The dissent relies in part on the affidavits of three jurors which speculate (in substantially identical language) that the outcome of the case would have been different if additional witnesses had been presented to corroborate appellant's whereabouts at the time the robbery was committed and that appellant was harmed by his counsel's failure

to do so. Obviously, if any such corroborating testimony had been elicited from Hearn at the hearing, no such juror affidavits would have been necessary to establish its materiality.

6. *Appellant's brief contains a statement that* Hearn "had seen a group of young African American males who matched the complaining witness's identification of the robbers enter the complaining witness's apartment shortly before the robbery. Ms. Hearn's observations corroborated Appellant's girlfriend's statement that this group did not include Appellant." However, no citation to the record is provided with this statement, nor can we find any support in the record of the hearing for it.

Similarly, footnote 3 of our former majority opinion in this case states, in part, "Trial

Without a record reflecting what facts, if any, Hearn could have actually provided, prejudice from counsel's failure to subpoena her was not shown by trial counsel's global and unsubstantiated characterizations that Hearn, to an extent, corroborated Germany, or that Hearn's testimony would have helped the defense.[7] Therefore, the trial court did not abuse its discretion by denying appellant's motion for new trial, and appellant's first point of error is overruled.

### Failure to Investigate and Call Other Witnesses

Appellant's second point of error claims that he received ineffective assistance because his counsel failed to investigate the identity and availability of Michelle Driver, Tamala Driver, and Patrice Brock as alibi witnesses. Appellant's trial counsel testified at the hearing that he was aware of these witnesses but his attempts to contact them were unsuccessful because they had moved from their previous residences and he had no leads on where they lived. Counsel further testified that he did not ask his investigator to locate these witnesses because he had no leads on them.

counsel testified without objection and related the substance of his interviews with Hearn and what he expected her testimony would have been had she testified at trial.'' Again, we find nothing in the record of the hearing remotely supporting this statement. The dissent would thus mandate a new trial on less of a showing than would even have been required to preserve error on the denial of a motion for continuance or writ of attachment. *See Erwin v. State*, 729 S.W.2d 709, 714 (Tex.Crim.App.1987) (noting that party requesting writ of attachment must show what the witness would have testified to); *Hardin v. State*, 471 S.W.2d 60, 62 (Tex.Crim.App.1971) (noting that defendant seeking continuance or attachment must offer a sworn statement saying what the witness would have testified to).

Although not mentioned in appellant's brief, the dissent also cites passages from Germany's *trial* testimony to show where Hearn had been located during the robbery such that she could corroborate appellant's alibi. However, Germany testified at trial on February 11, 1998, and the hearing was conducted, and the motion denied, on April 27, 1998. Therefore, the dissent would, in effect, hold that the trial court abused its discretion by basing its denial of the motion for new trial solely on the evidence presented at the hearing and not also *sua sponte* reminding itself of and remembering remote details of Germany's trial testimony which it had heard over ten weeks earlier during a four day trial and which were not even alluded to at the hearing. On the

contrary, it is neither the trial court's role to search for additional evidence to support a party's motion for new trial, nor the appellate court's role to search for additional arguments or evidence to support an appellant's brief.

7. This case is thus also distinguishable from those such as *Butler, Everage,* and *Shelton,* cited by appellant or the dissent, where evidence of the specific beneficial facts to which the absent witness could have testified was not only developed, but was provided by that witness (*i.e.,* rather than someone else). *See Butler,* 716 S.W.2d at 51–52, 55–56; *Everage v. State,* 893 S.W.2d 219, 222 (Tex.App.—Houston [1st Dist.] 1995, pet. ref'd); *Shelton v. State,* 841 S.W.2d 526, 527 (Tex.App.—Fort Worth 1992, no pet.). Because it is not necessary to our disposition of this case, we do not address whether a new trial could ever be *mandated* due to a failure to present a witness where neither an affidavit nor testimony from *that* witness is provided to show what the witness would actually say if placed under oath. However, we note that no other witness is competent to testify about what an absent witness would actually testify if placed under oath (or cross-examined); and, thus, overturning the entire first trial and conducting a new one in such a case would risk that the missing witness, when placed under oath, could provide no testimony favorable to the defense and that other witnesses who testified at the first trial might not again be available or be less able to remember important facts.

■ Because the record again contains no evidence of what testimony the alleged witnesses could have provided (not even defense counsel's assessment of its value), it is not possible to determine whether the witnesses could have supplied facts that would have supported appellant's position on his alibi defense or otherwise. Accordingly, appellant's second point of error also fails to show harm and is overruled.

Appellant's third point of error claims his trial counsel provided ineffective assistance by failing to call as a witness Kenneth Driver, who was present at trial because he had been subpoenaed by the prosecution. Although Driver did not testify at trial, he testified at the hearing that he was in the apartment during the robbery and clearly saw the two robbers, whose faces were mostly covered. However, Driver testified that he did not believe either robber was appellant because of their other physical differences from appellant, whom Driver described as his best friend.

■ Appellant's trial counsel testified at the hearing that he had spoken to Driver at least three times and intended to elicit testimony from Driver but later made a conscious decision not to do so because: (1) the favorable testimony Driver could have provided came out through a police officer's testimony; (2) Driver could have been cross-examined on the State's theory that he was part of a conspiracy with appellant to commit the robbery; and (3) any favorable testimony Driver could have provided would have been undermined by cross-examination revealing that he had a prior felony conviction. In light of these considerations and the deference we must afford strategic decisions made by trial counsel, appellant's third point of error does not demonstrate that the decision not to call Driver to testify fell below an objective standard of reasonableness.

Accordingly, the third point of error is overruled.

■ Appellant's fourth point of error contends that the foregoing conduct of his trial counsel, in the aggregate, deprived him of effective assistance of counsel. Although a number of errors can be found harmful in their cumulative effect, non-errors may not, in their cumulative effect, amount to error. *Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex.Crim.App.1999). Because appellant has demonstrated no deficient performance by his trial counsel, there can be no cumulative error or harm. Accordingly, his fourth point of error is overruled.

### Jury Argument

Appellant's fifth point of error asserts that the trial court erred by overruling his objection and denying his request for a mistrial in response to the following argument by the prosecutor:

[Prosecutor]: [W]hat happened on that night is that Kenneth Driver was home alone with [Alicia Johnson]. Kenneth Driver is the boyfriend of Tarauniqui's sister. Of course, Tarauniqui would mention something about her savings to her family members. Okay. Perhaps her sister let it slip one day that they were saving money.

[Defense counsel]: Excuse me, Your Honor, arguing outside the record.

THE COURT: Sustained.

[Defense counsel]: And ask that the jury be instructed to disregard.

THE COURT: Disregard the last comment.

[Prosecutor]: You can reasonably deduce whether or not the information about saving some money in the apartment ever got out of Tarauniqui's mouth to anyone else. You can reasonably deduce that once Kenneth

Driver got that information, he decided he was going to want some of the money.

[Defense counsel]: I'm going to renew the objection about arguing outside the record.

THE COURT: Overruled.

[Prosecutor]: You can reasonably deduce that his friend here was told by Mr. Driver. They planned it. . . .

■ Appellant complains on appeal that the foregoing argument, suggesting that there was a conspiracy between appellant and Driver, was "improper," because it was outside the record. However, the only portion of the argument associating Driver with appellant, assuming that appellant was even the person to whom the prosecutor was referring as "his friend here," was the final portion to which appellant failed to preserve a complaint by failing to object. The preceding portions of the argument implicate only Driver in the robbery, not appellant. Because appellant does not explain, and it is not otherwise apparent from the context, how those statements, even if outside the record, could have thus been adverse to appellant, this complaint affords no basis for relief.

Appellant also complains of the following portion of the prosecutor's argument:

[Prosecutor]: This man thought, because he had his shirt over his head and because he was a neighbor, that that thirteen-year-old girl would never finger him. This man was wrong. The only issue here is a recognition.

And ladies and gentlemen, I'm telling you that that thirteen-year-old girl wouldn't have any problems whatsoever seeing that man for a period of six or seven seconds.

[Defense counsel]: I'm going to object to the expression of his personal opinion by the prosecutor.

THE COURT: Sustained.

[Defense counsel]: Ask the jury be instructed to disregard.

THE COURT: Disregard counsel's last comment.

[Defense counsel]: And move for a mistrial.

THE COURT: Be denied.

■ Appellant claims that this argument: (1) attributed a motive to him that was not supported either by direct testimony or a reasonable deduction from the evidence; (2) injected a new and harmful fact, *i.e.*, motive, into the case; and (3) encouraged the jurors to base the credibility of the complaining witness's identification of appellant on the prosecutor's personal opinion that the girl was being truthful.

To the extent the robbers had shirts over their faces, which is undisputed, it is a reasonable inference that they did so to avoid being recognized or identified. Therefore, it is not apparent how the complained of argument introduced any new or unsupported motive to the case. Nor does this argument express a personal opinion by the prosecutor that the girl was being truthful, as appellant complains, but only that she had sufficient time to see the person she had identified as appellant. In any event, the foregoing argument is not of such a severe or flagrant nature that it's effect could not be overcome by the instruction to disregard given by the trial court.[8] Therefore, appellant's fifth point of error is overruled.

---

8. *See, e.g., Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex.Crim.App.2000) (holding that, where the jury has been instructed to disregard it, even a prosecutor's comment inviting the jury to speculate on the existence of evidence not presented does not warrant reversal unless it is offensive or flagrant), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001).

## Jury Deliberations

Appellant's remaining points of error challenge the trial court's actions during jury deliberations.

### Requiring Deliberations to Continue

The jury deliberated in this case from 2:50 to 5:20 p.m. on February 11, 1997, and from 9:00 a.m. to 2:00 p.m. on February 12, during which a lunch break and other breaks were taken. At about 11:00 a.m. on February 12, the jury sent the trial court a note stating:

> We, the jury, cannot reach a unanimous verdict. We have studied the evidence and had very thorough discussions, and very open discussions and each juror firmly believes that additional discussions will not resolve the matter. We have taken numerous votes and each time there was a significant split in the vote. Discussions subsequent to requesting testimony have indicated that the [previously] requested testimony would not change anyone's opinion.

The court thereafter said the following to the jury:

> Relative to your note, if you don't want the testimony read, then I certainly have no right to insist that you read it; however, I'm not going to, at this time, discharge this jury. As I told you yesterday—and I take the same position now—I don't want anybody to be forced to do anything and I don't want to do anything that violates anybody's conscience. But on the other hand, I certainly—you need to reexamine your positions. And if you can reach a verdict, why, we want you to do that. As I told you, if you don't do it, then I've got to send over for another panel, and we go

through the same process again. There is going to be some jury somewhere down the line that's going to make a determination of guilt or innocence in this case based upon the testimony.

■ Appellant's sixth point of error contends that the trial judge abused his discretion by giving the above supplemental instruction to the jury urging them to reach a verdict. Appellant does not challenge the content of the instruction but complains only that giving any such instruction was unnecessary and coercive because the jury was willing and able to continue deliberating and attempting to reach a verdict on their own. However, because the jury's note to the court conveyed precisely the opposite sentiment and had not been withdrawn by the jury, we do not agree with appellant that giving an instruction urging them to reach a verdict was unreasonable. Accordingly, appellant's sixth point of error is overruled.

■ Appellant's eighth point of error contends that the trial court abused its discretion by ordering the jury to continue deliberating after the jurors communicated their inability to reach a verdict.[9] After a case is submitted to the jury, the court may, in its discretion, discharge the jury where it has been kept together for such time as to render it altogether improbable that it can agree. Tex.Code Crim. Proc. Ann. art. 36.31 (Vernon 1981). However, there is no limit on the length of time a jury may deliberate. *Guidry v. State*, 9 S.W.3d 133, 155 (Tex.Crim.App.1999). Thus, reversal is mandated only if the record reveals that the trial court abused its discretion by holding the jury for deliberations. *Jackson v. State*, 17 S.W.3d 664, 676 (Tex.Crim.App.2000).

9. In that appellant's sixth and eighth points of error take contrary positions as to whether the jury had indicated an inability to reach a verdict, we interpret these points as being presented in the alternative.

As noted above, the jury deliberated in this case for, at most, an elapsed time of 7.5 hours during which a lunch break and other breaks were taken. The only indication in the record of an impasse is the note (quoted above) that the jury sent to the trial judge at 11:00 a.m. on February 12. In reply to that note, the trial court gave the supplemental instruction quoted above. After taking a lunch break, the jury returned a verdict at 2:00 that afternoon.

■ Appellant has not cited a case in which a conviction has actually been reversed for requiring a jury to deliberate too long and thus illustrating circumstances in which a trial court's conduct has been unreasonable in that regard. In this case, the length of time the jury spent deliberating was certainly not excessive in relation to the seriousness of the felony charge appellant was facing. Nor do the circumstances otherwise suggest that it was altogether improbable that the jury could agree when it reported its first and only deadlock after, at most, 4.5 hours of deliberations. Accordingly, appellant's eighth point of error is overruled.

### Soliciting Numerical Division

Appellant's seventh point of error argues that the trial court erred in asking the jury, during their deliberations, how they were divided: "How do you stand? Twelve ... to two? .... Six to six, or nine to three, or eight to four? Not any particular for or against. But have you taken a vote? .... What's the last vote?" The jury foreman replied, "We were pretty well split down the middle."

■ Appellant contends that, under federal case law, the trial court's asking the numerical division of the jury was coercive and thereby deprived appellant of a fair trial, particularly in the context of the subsequent jury deadlock and supplemental instruction, discussed above. *See Bras-*

*field v. United States,* 272 U.S. 448, 449–50, 47 S.Ct. 135, 71 L.Ed. 345 (1926) (reversing conviction where trial judge inquired and was informed how jury was divided numerically, without indication of which number favored conviction, and despite that defense counsel made no objection). However, the Court of Criminal Appeals has expressly declined to follow such a contention:

Nevertheless, appellant insists the trial court committed error when it furnished the *Allen* charge while cognizant of the numerical division of the deadlocked jury. *See United States v. Sae-Chua,* 725 F.2d 530 (9th Cir.1984). In the instant case, in the period of deliberation prior to the Allen charge, the jury foreperson had informed the trial court [without being asked] of the numerical division of the jury. Appellant contends that under federal case law, the possession of such information makes an *Allen* charge coercive. Appellant's reliance upon *Sae-Chua* is misplaced. In *Sae-Chua* the Ninth Circuit, citing [*Brasfield* ] found reversible error when the trial court polled a deadlocked jury regarding the likelihood further deliberations would have in achieving a verdict.... *Brasfield* created a prophylactic rule forbidding the federal trial courts from questioning their juries regarding numerical division. *Id.* However, such a prophylactic rule is based upon the U.S. Supreme Court's exercise of supervisory powers and not upon any notion of constitutional infraction. *Lowenfield v. Phelps,* 484 U.S. at 239–249 n. 3, 108 S.Ct. 546,.... The prophylactic rule present in *Brasfield* and *Sae-Chua,* supra, simply has no application to this state proceeding or this Court's holding.

We are mindful that in some contexts, a trial court might engender coercion by actively identifying jurors with minority

viewpoints and tacitly instructing them to reexamine their perspectives. However, in the case at bar, the trial court did not probe the jury or attempt to identify the minority jurors. The trial court's information as to numeric division was an unsolicited and extraneous reference in a note from the jury. In this context we find the *Allen* charge to be noncoercive.

*Howard v. State,* 941 S.W.2d 102, 124 (Tex. Crim.App.1996). In light of *Howard,* the trial court's inquiry into the jury's numerical division, even if inappropriate, was not reversible error. Accordingly, appellant's seventh point of error is overruled.

### Cumulative Error

Appellant's ninth point of error contends that the overall combination of the foregoing actions by the trial court during jury deliberations had a coercive effect on those deliberations and thereby deprived appellant of a fair trial. As noted previously, although a number of errors could be found harmful in their cumulative effect, non-errors may not, in their cumulative effect, produce error. *Chamberlain,* 998 S.W.2d at 238. Because appellant has demonstrated no error by the trial court, there can be no cumulative error or harm. Therefore, appellant's ninth point of error is overruled, and the judgment of the trial court is affirmed.

Justices YATES, ANDERSON, HUDSON, FOWLER, and FROST join in the Majority Opinion.

Senior Justice WITTIG filed a Concurring and Dissenting Opinion.

Former Judge BAIRD filed a Dissenting Opinion, in which Senior Chief Justice MURPHY and Former Justice AMIDEI join.

DON WITTIG, Senior Justice, concurring and dissenting on rehearing en banc.

I concur with the majority on the issue of ineffective assistance of counsel. While trial defense counsel's conduct may have fallen below acceptable standards, the incomplete record of all or any of the prospective testimony leaves us unable to gage the second prong of *Strickland.* Therefore the majority correctly affirms this issue on direct appeal. The dissent aptly notes that trial defense counsel was ineffective because he did not use tools at his disposal to corroborate the alibi defense. While trial defense counsel clearly should have subpoenaed the corroborating witness in this very close swearing match, he failed to do so.

Beside my disagreement that this case merits *en banc* consideration mentioned below, I believe the majority opinion ignores part of the state's final argument which was clearly outside the record. Because of the tenuous nature of the state's case, it seems to me the argument of the prosecutor, making up conversations in contradiction to the state's own evidence, was harmful error requiring reversal.

In essence this case boils down to the testimony of a thirteen-year old girl. In a matter of several seconds, she swears she could and did identify a man with a T-shirt over his head. This identification is made on the basis of seeing only appellant's eyes and shoes. Other adults present could not and did not identify appellant. Against this young teenager's identification stands the testimony of appellant's girlfriend, Ava. Ava saw two men other than appellant enter the apartment about the time of the robbery. It is no wonder the jury repeatedly advised the trial court they were deadlocked. The jury sent out a note at 11:00 a.m., February 12th, stating: "We, the jury, cannot reach a verdict." At 5:18

in the evening, the trial court improperly inquired of the jury: "What's your last vote?" The jury responded they were pretty well split down the middle. The jury was sent home by the retired senior judge presiding and continued deliberating the next day. According to trial counsel, testimony in this case only lasted four hours and fifty minutes. Jury deliberations spanned two days. Against this backdrop, I am constrained to dissent to part of issue five, improper jury argument by the state.

The majority correctly recites the record of the state's argument. The prosecutor argued Tarauniqui's sister's boyfriend, Kenneth Driver, was at the house and that: "Of course, Tarauniqui would mention something about her savings to her family members. Okay. Perhaps her sister let it slip one day that they were saving money." Trial defense counsel timely objected to this argument outside the record, the objection was properly sustained, and the jury properly instructed to disregard this extraneous argument. Then the state refused to follow the ruling of the trial court and reiterated the identical argument. Masking the extraneous speculation, the state argued the jury could deduce whether or not the word of the savings money ever got out of Tarauniqui's mouth to anyone else. "You can reasonably deduce that once Kenneth Driver got that information, he decided he was going to want some of the money." Again, defense counsel timely objected to the argument outside the record. Inexplicably, the senior judge overruled the same objection to the same argument he sustained moments before. The able prosecutor

slammed the cell door shut right after the trial court's erroneous ruling. The state's attorney concluded: "You can reasonably deduce that his friend here was told by Mr. Driver. They planned it." [1]

So what the state argued was: Taraunique might have told a sister, say Tamala. Then Tamala might have told Alicia. Then Alicia might have told Driver. Then, the jury could reasonably deduce Driver told Melancon.

The state argues, and the majority implicitly agrees, this was a reasonable inference or deduction from the evidence. The state's own witness, Tarauniqui, testified she had just moved her money, and only her husband, Eze, knew the whereabouts of the money. The state's own evidence, therefore, showed no one else knew the whereabouts of this money. Tarauniqui's sisters did not know, Driver did not know; only her husband knew where the money was. Contrary to the state's argument about "What happened that night ..." both Tarauniqui and her husband were gone that evening after the money was moved.[2] How can anyone deduce or infer, against the state's own evidence, that a person no longer in the house conveyed information from one sister to another who, in turn, conveyed the information to Driver, who then conveyed the information to Melancon?

A valid argument can only be made from a valid premise. If the premise is invalid, the argument is invalid. One cannot deduce from either the unknown or, more like this case, from the contrary or the

---

1. The majority opinion ignores the context of the extra-record argument. It further ignores the patent effect of the error by allowing the state to manufacture motive and opportunity out of whole cloth. Similarly, the majority opinion ignores the preserved error I address.

2. The state even argued that Alicia and Driver were alone. At some earlier date Tarauniqui may have told Tamala, another sister, about the money, but not where it was stashed. Tamala, like Tarauniqui, was not present, as the state argued, on the night in question.

impossible.[3]

The law is well settled. In *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App. 2000), we are informed that the approved general areas of argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Hathorn v. State*, 848 S.W.2d 101, 117 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). Even when an argument exceeds the permissible bounds of these approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, **or injects new facts harmful to the accused into the trial proceeding.** (Emphasis added.) *Todd v. State*, 598 S.W.2d 286, 296-97 (Tex.Crim.App.1980). The remarks must have been a willful and calculated effort on the part of the state to deprive appellant of a fair and impartial trial. *Cantu v. State*, 939 S.W.2d 627, 633 (Tex.Crim.App.1997), *cert. denied*, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997). In most instances, an instruction to disregard the remarks will cure the error. *Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex.Crim.App.1994), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994); *Cooks v. State*, 844 S.W.2d 697, 727 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993). Such was not the case here. To the contrary, by overruling appellant's objection to the improper argument, the trial court put "the stamp of judicial approval" on the argument, thus magnifying the potential harm. *See Good v. State*, 723 S.W.2d 734, 738 (Tex.Crim. App.1986).

In *Holliman v. State*, 879 S.W.2d 85 (Tex.App.—Houston. [14th Dist.] 1994, no pet.), we addressed the extra-legal extraneous argument of the state. The prosecutor suggested the reason appellant didn't go the hospital or call the police was because the fight was over drugs. The prosecutor again went outside the record and argued why Moore refused to give her forty year old son a key to their home. There, we held the prosecutor fabricated "her own explanation by injecting facts not in evidence." *Id.* at 87. These arguments were deemed harmful error. *Id.* Here, even had Tarauniqui told one sister she was saving some money, there is not a shred of evidence that that sister told another sister or anyone else, much less that anyone told her absent boyfriend the whereabouts of any money. To suggest Tarauniqui told an unknown sister, who told Alicia, who told Driver, who told Melencon is like a fisherman throwing chum on the water.

Because the trial court erred in overruling appellant's objection to the argument, I now consider whether those errors warrant reversal. *See* TEX. R. APP. P. 44.2. Erroneous rulings related to jury argument are generally treated as non-constitutional error within the purview of Rule 44.2(b). *Martinez v. State*, 17 S.W.3d 677, 692 (Tex.Crim.App.2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). Rule 44.2(b) requires any error that does not affect substantial rights to be disregarded. In other

---

**3.** It is not permissible to base an inference upon an inference in order to convict upon circumstantial evidence. *Thomas v. State*, 148 Tex.Crim. 526, 189 S.W.2d 621, 625 (1945). Here, the house of cards is even more tenuous; an inference is based upon another inference, upon another and yet another. Not only is such an argument illogical, but doubly impermissible when it is directly in the face of the state's own evidence to the contrary.

words, "[a] criminal conviction should not be overturned for non-constitutional error if the appellate court, after reviewing the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect." *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). The following three factors are used to analyze the harm associated with improper jury argument: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Martinez*, 17 S.W.3d at 692–93; *Mosley*, 983 S.W.2d at 259.

I have already discussed the tenuous nature of the state's case, turning as it does upon the thirteen year old's identification through a T-shirt, of appellant. After sustaining the identical objection to the same extraneous argument moments before, the state reiterates not once, but twice, for a total of three times, the highly improper argument. By the repetition of this extra-legal speculation as fact, the prosecution was able to fabricate just enough motive and opportunity to sway the six jurors who had held out more than a day for acquittal. This is patently not a case with certainty of conviction; this is the weakest of cases, against a man without a felony record, who testified on his own behalf. In effect, the state's illicit argument provided the corroboration through illegitimate words, while the defense failed to produce corroboration through the legitimate witness.

Finally, the futility of the *en banc* court's treatment of this case for well over one year palpably demonstrates the wisdom of TEX.R.APP. P. 41.2(c). *En banc* consideration of a case is disfavored and reserved to preserve uniformity or for extraordinary circumstances. I disagree with the court's consideration of this case *en banc*.

Even without addressing the visiting judge's improper solicitation from the jury of its vote before verdict and giving of an *Allen* charge, I would reverse and remand[4] this case for a new trial based upon the prejudicial and prohibited argument of the state.

CHARLES F. BAIRD, Justice, dissenting on rehearing en banc.

On original submission, we handed down a panel opinion which sustained appellant's first point of error alleging ineffective assistance of counsel, and reversed the judgment of the trial court. One member of the panel dissented. Today, a majority of the *en banc* court grants the State's motion for rehearing, withdraws our previous opinions and affirms the judgment of the trial court. Because the action of the *en banc* court is fundamentally flawed in three respects, I lodge this dissent.

## I. En Banc Consideration.

The decision to grant a motion for rehearing by an *en banc* court is governed by Rule 41.2 of the Texas Rules of Appellate Procedure. TEX.R.APP. P. 41.2. The portion of that rule relevant to this case provides:

(c) En banc consideration disfavored. En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless

---

4. Assuming, as the majority suggests, trial defense counsel once again failed to preserve error, (which I dispute), then surely both defense counsel and the majority have provided fodder for future hearings on this important constitutional issue of ineffective counsel.

extraordinary circumstances require en banc consideration....

Therefore, for rehearing to be authorized in the instant case, there must be a necessity to maintain uniformity in our decisions or extraordinary circumstances. However, neither of those conditions is presented in the instant case.

### A. Uniformity Of Decisions.

On original submission, Justice Edelman handed down a dissenting opinion. *See* Appendix A. However, that dissent did not cite any case from this court that was inconsistent with reversal. Indeed, that dissent cited no authority whatsoever. For its part, the State's motion for rehearing cites three opinions from this court. Those opinions are cited for general propositions of law in the area of ineffective assistance of counsel claims. However, the State agrees that these principles were reaffirmed in the majority opinion on original submission. While the State may disagree with the application of those principles in the instant case, it cannot be said that *en banc* rehearing is necessary to maintain uniformity when the State concedes those principles were "reaffirmed." Finally, when today's *en banc* opinion dealing with the first point of error is closely examined, the reader will find there is not a single citation to a case from this court. Therefore, it cannot be said that rehearing is necessary to maintain uniformity of *our* decisions.

### B. Extraordinary Circumstances.

The only remaining reason for *en banc* consideration would be the presence of extraordinary circumstances. But there was nothing extraordinary about our holding of ineffective assistance of counsel on original submission. Although infrequent, this court has made similar findings in the past. *Milburn v. State,* 15 S.W.3d 267, 270 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd); *Turner v. State,* 755 S.W.2d 207 (Tex.App.—Houston [14th Dist.] 1988, no pet.); *Miller v. State,* 728 S.W.2d 133, 134–135 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd). Therefore, our finding on original submission that trial counsel rendered ineffective assistance cannot serve as an extraordinary circumstance to warrant *en banc* consideration of the instant case. *Cf. Willover v. State,* 38 S.W.3d 672, 684 (Tex. App.—Houston [1st Dist.] 2000, pet. grt'd) (Taft, J., dissenting) ("The panel opinion's holding effectively turns the prevailing rule, 180 degrees around, to overturning a trial court's ruling on appeal if such ruling is incorrect for a reason not previously mentioned either at trial or on appeal. I find this beyond extraordinary.").

### C. Conclusion.

As rehearing is neither necessary to maintain uniformity of our decisions, nor the result of an extraordinary circumstance, the *en banc* decision to grant rehearing in this case is a direct violation of rule 41.2(c). The State's motion for *en banc* rehearing should be overruled and the panel opinion of original submission should stand.

### II. Incorrect Factual Analysis.

The *en banc* majority opinion provides no mention of the testimony from the trial of the instant case, but rather focuses exclusively on the testimony of trial counsel at the motion for new trial hearing. Only through this distorted lens can the majority state the record does not reflect "what facts, if any, Hearn could have actually provided." *Supra* at 380. The majority employs this tact on the faulty premise that they can consider only the testimony from the motion hearing because the trial court cannot be expected to remember the testimony from appellant's trial. *Supra* at

380 n. 7. But our law is clear that the trial judge is presumed to know what has previously taken place in the case before him. *Vahlsing, Inc. v. Mo. Pac. R.R. Co.*, 563 S.W.2d 669, 674 (Tex.Civ.App.—Corpus Christi 1978, no writ) ("It is axiomatic that a party is not required to prove facts that a trial court judicially knows. A trial judge judicially knows what has previously taken place in the case on trial."). This is why the trial court is required to conduct a hearing on a motion for new trial *only* on matters *not* determinable from the record. *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim.App.1993) ("[T]he trial judge abuses his discretion in failing to hold a hearing on a motion for new trial that raises matters which are not determinable from the record.").

Therefore, to correctly evaluate appellant's ineffective assistance of counsel claim, we must be aware of both the trial testimony as well as that at the motion for new trial hearing. Moreover, because the alleged deficient conduct occurred at the trial phase, our analysis must necessarily include a discussion of the evidence offered there before we can determine if trial counsel was deficient. Because the majority fails to do so, I must set forth that evidence now. I will also provide a more detailed account of trial counsel's testimony from the motion for new trial hearing.

## A. Trial on the Merits

### i. The State's Case In Chief

In July of 1997, the thirteen-year-old complainant was living with her mother in a large apartment complex in Houston. Also living in the apartment were the complainant's sisters, Tammy and Tracie, Tracie's husband, Alijua Eze, and Tammy's child, "Little Kenneth" Driver. In the late night hours of July 28, the complainant was in their second floor apartment with her nephew, Little Kenneth, and his father, Kenneth Driver, while Tammy, Tracie and Eze were at work. The apartment was dimly lit to permit Little Kenneth to sleep; the dining room light was on and the television was on, but no lights were on in either the living room or the kitchen. During the course of the night, Kenneth Driver left and returned to the apartment several times. Shortly after his final return, two men suddenly entered the apartment. The men had their faces covered with t-shirts pulled over their heads, exposing only their eyes. One of the men went directly to the complainant. The complainant had a couple of seconds to see the man before being pushed to the floor. The man held the knife to her throat, took her to the bathroom and closed the door. The complainant stated she had a total of six or seven seconds to get from where she was sitting at the time the men entered the apartment to the bathroom. The complainant could not see the men clearly and for some period of time the complainant could not see them at all as her face was toward the ground. After a while, Kenneth Driver came into the bathroom and stated the robbers had left. The complainant identified appellant as the man with the knife; she identified appellant by his eyes and by his shoes, which were the kind she had seen appellant wear around the apartment complex. She described his weight as 190 pounds.

After the robbery, several people entered the apartment; two of these individuals were Ava Germany and *Rhoda Hearn*.[1] Germany was appellant's girlfriend and *Hearn* was a resident of the

---

1. This individual is, at various times, referred to as Rhoda, Rita or Hearn. Her name will be *italicized* when mentioned in the summary of the trial testimony to emphasize her interaction with the witnesses for both the State and defense.

apartment complex. The complainant left her apartment and went to *Hearn's* apartment where the complainant called her sister, Tracie, and told her of the robbery.

When Tracie arrived at the apartment, several neighbors and friends were there. Tracie did not remember seeing Germany, but did recall seeing *Hearn*. Tracie spoke to the complainant who stated appellant was one of the robbers. Tracie called the police, who subsequently arrived to investigate. Tracie testified she had previously hidden $300—$400 behind her bed; that money was taken in the robbery.

At 12:43 a.m. on July 29, Officer Eric Johnson of the Houston Police Department was dispatched to the robbery scene. Officer Johnson spoke with the complainant and Kenneth Driver. The complainant described her assailant as a black male, five feet, seven inches tall, weighing 190 pounds, wearing a long-sleeved black shirt, black jeans and a black ski mask. The complainant stated the assailant's first name was Albert, and gave Officer Johnson the apartment number where Albert lived in the same complex. The complainant did not mention the assailant's shoes. Kenneth Driver was unable to identify the robbers other than their being two black males. A search of the apartment for a knife or masks was fruitless. Although Officer Johnson requested a crime scene unit to process the apartment for finger prints, the request was denied. Officer Johnson did not attempt to locate appellant while at the apartment complex.

Sergeant David Rieks of the Houston Police Department conducted the follow up investigation. Sergeant Rieks met with the complainant two days after the robbery and showed her a photo spread containing appellant's photograph. The complainant picked appellant's picture from the spread. Sergeant Rieks obtained a warrant and arrested appellant. While processing appellant, Sergeant Rieks noted appellant was five feet, seven inches tall and weighed 150 pounds.

### ii. Appellant's Case–In–Chief

During his case-in-chief, appellant presented the defenses of alibi and misidentification, which are "two sides of the same coin." *See Butler v. State*, 716 S.W.2d 48, 54 (Tex.Crim.App.1986). These defenses were asserted through a single witness, appellant's girl friend, Ava Germany. In July 1997, Germany was living with appellant and his mother in the same apartment complex as the complainant. On July 28, 1997, Germany had a conversation with the complainant's sister, Tammy, who asked Germany to keep an eye on the complainant and Little Kenneth, while Tammy was at work. On that date at approximately 11:00 p.m., Germany, appellant, and a friend were listening to a radio in the courtyard of the apartment complex. This area was approximately 500 feet from the complainant's apartment. Appellant was wearing a white t-shirt.

Germany left appellant to check on the complainant. After arriving at the complainant's apartment, Germany was told everything was fine. Germany left the complainant's apartment but stopped to talk with a friend before returning to appellant. While visiting with her friend, Germany saw Kenneth Driver enter the complainant's apartment. A few minutes later, Germany saw two black males enter the apartment. Germany testified that neither man was appellant. Germany did not see the men leave the apartment. After seeing two men enter the complainant's apartment, Germany returned to appellant who had moved even farther away from the complainant's apartment. Appellant was with *Hearn* and two others, Darrin and Allison. Germany testified appellant

did not appear to be excited, sweaty or to have recently engaged in physical activity.

Later, Germany was told of the robbery and both she and appellant went to the complainant's apartment. When Germany arrived, the complainant was hysterical. To calm and console her, Germany took the complainant to *Hearn's* apartment. At some point, Germany told *Hearn* of seeing the two men enter the complainant's apartment. Germany stayed with the complainant approximately fifty minutes until her sisters arrived. During this time, the complainant did not tell Germany that appellant was involved in the robbery.

Following the robbery, Germany did not see appellant with an amount of money consistent with that taken in the robbery, nor did his financial situation change after the robbery. Finally, on cross-examination, Germany testified that at the time of the robbery, appellant weighed 140 pounds.

After deliberating for several hours, the jury indicated they were deadlocked and could not reach a verdict.[2] However, the trial court ordered the jury to continue deliberating. As a result of the continued deliberations, the jury found appellant guilty of aggravated robbery.

## B. The Motion for New Trial Hearing

Following appellant's conviction, trial counsel was relieved of any further duty to appellant and other counsel was appointed to prosecute this appeal. Trial counsel wrote to appellate counsel notifying her of Hearn, who could have testified on appellant's behalf. Based upon the representations of trial counsel, appellate counsel prepared a motion for new trial. At the hearing thereon, trial counsel testified he located Hearn at an apartment complex and spoke to her the weekend before trial. Hearn was able to corroborate Germany's testimony but had "baggage," i.e., felony probation for a drug offense. Despite her probationary status, trial counsel wanted Hearn to be a witness, believing her testimony would help appellant's defense.[3] Specifically, counsel stated: "I feel like anytime you try an alibi case where your primary witness is a family member or loved one, if you can get corroboration, it strengthens the defendant's alibi."

However, counsel did not subpoena Hearn to secure her presence for trial. Instead, counsel arranged for Hearn, Germany, and appellant's mother to meet trial counsel at a predetermined location and then the four would proceed to court. This meeting was to occur the morning after the State rested its case-in-chief.[4] When Hearn did not appear at the appointed location, trial counsel was told Hearn was working at the Jack In The Box restaurant. Counsel proceeded to court, but did not make a record regarding Hearn's absence or request a continuance. When asked if he knew the steps necessary to secure Hearn's presence or, in the alternative, to preserve this matter for appellate review, counsel stated:

> Sure. That would have been the way to preserve the error, if I had a witness that I wanted that was unavailable, to issue a subpoena and then ask for a writ

---

**2.** According to trial counsel, the trial took four hours and fifty minutes. Yet the jury deliberated for a longer period of time.

**3.** This is borne out by counsel's voir dire where he questioned the venire whether they would automatically disbelieve a witnesses who had been impeached with a prior conviction.

**4.** The trial began on Monday, February 9, 1998. The State rested its case-in-chief on Wednesday, February 11, 1998.

of attachment, and file a written verified motion for continuance.[5]

When asked why he had not made any such attempt, trial counsel answered: "I don't know." When asked why he wrote the letter informing appellate counsel of the failure to secure Hearn's presence at appellant's trial, counsel forthrightly stated: "[I]f I drop the ball, you know, that I got to stand up and accept it.... I think it's the right way to handle it, rather than to hide and not confront it."

The record clearly establishes that trial counsel knew where Hearn lived because he had discussed the case with her at her residence the weekend before the trial. And trial counsel knew where Hearn was employed because he was told by both Germany and appellant's mother.

Trial counsel further testified he was unable to locate the two individuals who were with appellant and Hearn at the time of the robbery. Therefore, Germany and Hearn were the only two witnesses who could have supported appellant's misidentification/alibi defense.

The motion for new trial was supported by affidavits from three jurors who swore they would not have voted to convict appellant had trial counsel presented additional testimony supporting appellant's defenses of alibi and misidentification. These affidavits were considered by the trial court and made a part of the appellate record. At the conclusion of the hearing, the court denied appellant's motion for new trial.

### C. Analysis.

When the trial testimony is considered in conjunction with the testimony of trial counsel from the motion for new trial hearing the following facts are undisputed:

1. Hearn was present at the location and time of the robbery;

2. Hearn was with appellant and Germany before and during the robbery;

3. Hearn was with Germany, the complainant and Tracie immediately following the robbery;

4. Hearn's presence corroborates Germany's testimony which established appellant's defenses of alibi and misidentification;

5. Trial counsel was aware of Hearn, having personally interviewed her;

6. Trial counsel believed Hearn was an important witness;

7. Trial counsel believed Germany's testimony needed to be corroborated because of her close relationship with appellant;

8. Trial counsel knew Hearn was the only available witness who could corroborate Germany's testimony;

9. Trial counsel knew where Hearn lived and worked;

10. Upon learning that Hearn would not appear voluntarily, trial counsel knew what steps to take to insure Hearn's presence at trial;

11. Trial counsel took no steps to insure Hearn's presence;

12. Trial counsel had no explanation for not taking any action to secure Hearn's presence at trial;

---

5. Counsel's statement of the law is correct. Moreover, under these circumstances, it would have been an abuse of discretion for the trial court to have refused a motion for continuance. *Foster v. State,* 497 S.W.2d 291, 292–293 (Tex.Crim.App.1973) (trial court abused discretion in denying motion for continuance where counsel first located material witness on Saturday prior to trial). *See also* TEX.CODE CRIM. PROC. ANN. arts. 29.03, 29.06 & 29.13.

13. Trial counsel informed appellate counsel that Hearn could have testified on appellant's behalf; and,

14. Trial counsel admitted he "dropped the ball" by not securing Hearn's presence at trial.

## D. Conclusion.

The majority's factual analysis of this point of error is fundamentally flawed because it wholly ignores the evidence admitted at trial, and considers trial counsel's testimony from the motion for new trial hearing in a vacuum. When the testimony from both the trial and the motion hearing are considered, the evidence is undisputed that Hearn was a crucial witness who was available and could have provided testimony beneficial to appellant, and trial counsel failed to secure her presence at appellant's trial.[6]

## III. Absence Of Legal Analysis.

The majority uses its incorrect factual analysis as a means to do no legal analysis. But when the facts are correctly stated, such an analysis is mandated. Therefore, I must now resolve the issues presented by appellant's first point of error.

## A. Standard of Appellate Review

The right to the effective assistance of counsel is guaranteed to criminal defendants by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, section 10 of the Texas Constitution. The well known two prong standard of *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 2062–2063, 80 L.Ed.2d 674 (1984), is utilized when reviewing ineffective assistance of counsel claims. The reviewing court must first decide whether trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. If counsel's performance was deficient, the reviewing court must decide whether there is a "reasonable probability" the result of the trial would have been different but for counsel's deficient performance. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Absent both showings, an appellate court cannot conclude the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *See id.* at 687, 104 S.Ct. 2052. *See also Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex.Crim. App.1993); *Boyd v. State*, 811 S.W.2d 105, 109 (Tex.Crim.App.1991).

The defendant bears the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *See Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim.App.1998); *Riascos v. State*, 792 S.W.2d 754, 758 (Tex.App.—Houston [14th

---

**6.** I pause to note that trial counsel testified without objection and related the substance of his interview with Hearn, that her testimony was important and would have been corroborative of Germany's. Testimony that is received without objection shall not be denied probative value. *See* TEX.R. EVID. 802. Therefore, those assertions must be accepted by us a proven. Corroborating evidence is defined as "[e]vidence supplementary to that already given and tending to strengthen or confirm it. Additional evidence of a different character to the same point." Blacks Law Dictionary, 6th ed., pg. 344–45. Therefore, in a case as close as this, any degree of corroborative testimony would have been important because it would have served the dual purpose of establishing appellant's misidentification/alibi defense and supporting Germany's credibility which was suspect because of her relationship with appellant.

Finally, if the majority is correct that the record is insufficient to establish what Hearn's testimony would have been, then appellant has suffered the cruel fate of receiving ineffective assistance of counsel both at trial and at the motion for new trial hearing.

Dist] 1990, pet. ref'd). Allegations of ineffective assistance of counsel will be sustained only if they are firmly founded and affirmatively demonstrated in the appellate record. *See McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997); *Jimenez v. State*, 804 S.W.2d 334, 338 (Tex.App.—San Antonio 1991, pet. ref'd). When handed the task of determining the validity of a defendant's claim of ineffective assistance of counsel, any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex.Crim.App. 1984).

Generally, the trial record will not be sufficient to establish an ineffective assistance of counsel claim. *See Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex.Crim. App.1999). This is true because normally a silent record cannot rebut the presumption that counsel's performance was the result of sound or reasonable trial strategy. *See Strickland*, 466 U.S. at 688, 104 S.Ct. at 2052; *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.Crim.App.1991). However, a defendant may rebut the presumption by providing a record from which the appellate court may determine that trial counsel's conduct was not based upon a strategic or tactical decision. *See Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex.Crim.App.1994). This record may be provided, as in the instant case, *via* a motion for new trial hearing.[7]

### B. Deficient Performance

We must first decide whether counsel rendered deficient performance by failing to secure Hearn's presence at trial. Counsel has the duty to interview potential

witnesses and to make an independent investigation of the facts and circumstances of the case. *See Butler*, 716 S.W.2d at 54 citing *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Crim.App.1978), and quoting *Ex parte Lilly*, 656 S.W.2d 490 (Tex.Crim. App.1983); *Flores v. State*, 576 S.W.2d 632, 634 (Tex.Crim.App.1978); *State v. Thomas*, 768 S.W.2d 335, 336–37 (Tex. App.—Houston. [14th Dist.] 1989, no pet.) ("[D]efense counsel has a responsibility to seek out and interview potential witnesses[.]"); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (citing *Bell v. Watkins*, 692 F.2d 999, 1009 (5th Cir.1982), and *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir.1979)). The obvious corollary to that rule is that once counsel has investigated the facts and developed a defensive theory, counsel "has a professional duty to present all available testimony and other evidence to support the defense of his client." *Thomas*, 768 S.W.2d at 336–37; *Butler*, 716 S.W.2d at 48; *Shelton v. State*, 841 S.W.2d 526, 527 (Tex.App.—Fort Worth 1992, no pet.); *Everage v. State*, 893 S.W.2d 219 (Tex.App.— Houston [1st Dist.] 1995, pet. ref'd).

The duty to present a defense is no transient notion, and the ability to present all available evidence is secured in both the United States and Texas Constitutions which provide for the right of compulsory process. *See* U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor ..."); Tex. Const. art. I, § 10 ("In all criminal prosecutions the accused ... shall have compulsory process for obtaining witnesses in his favor ...") *See also* Tex. Code Crim. Proc. Ann. art. 1.05. The Texas Legislature has enacted a statutory scheme to effectuate these constitutional

---

**7.** A motion for new trial is required when necessary to adduce facts not in the record.

*See* Tex.R.App. P. 21.2

guarantees. *See* Tex.Code Crim. Proc. Ann. Ch. 24. Because of these constitutional and statutory provisions guaranteeing defendants the right to present their defensive testimony, the Court of Criminal Appeals does not permit defense counsel to depend upon a witness' promise or assurance to appear at the trial. Instead, defense counsel must exercise due diligence in securing the testimony of prospective witnesses through the issuance of a subpoena. *See Drew v. State,* 743 S.W.2d 207, 228 n. 17 (Tex.Crim.App.1987) (citing Tex.Jur.3d, Vol. 25, Criminal Law, § 3490, pp. 370–371) ("It is no excuse for the failure to issue a subpoena that the defendant relied on the witness' promise to attend.").

This court has followed the dictates of the Court of Criminal Appeals in this area. In *Rodriguez v. State,* 21 S.W.3d 562 (Tex. App.—Houston [14th Dist.] 2000, pet ref'd) (opinion on rehearing) we considered the trial court's denial of a motion for continuance when a witness did not appear as promised. In dealing with the obligation of defense counsel to secure the presence of witnesses, we stated:

> Because a missing witness is a risk inherent in almost every case, the party seeking to present the witness must exercise reasonable diligence to protect against the possibility that a witness will not appear as promised. Taking appropriate measures (i.e., arranging for the timely issuance and service of a subpoena to compel the witness's appearance at trial) is especially critical when the witness is material to the case. *Failure to take the necessary steps to secure attendance of a key witness demonstrates a lack of reasonable diligence.* Here, appellant argues he was entitled to a continuance notwithstanding his failure to arrange for the issuance of a subpoena for the missing witness because she had appeared voluntarily on prior occa-

sions and had assured him she would be available for trial. While the witness may have led appellant to believe that a subpoena was unnecessary to secure her attendance, appellant must be held ultimately responsible for his failure to seek compulsory process for a witness as important to his case as [], even if she had proved reliable and cooperative in the past.

*See id.* at 566 (emphasis added).

Not surprisingly, several courts have found counsel ineffective for failing to secure the attendance of a witness. In *Butler,* 716 S.W.2d 48, the defendant was charged with aggravated robbery. His identification rested on the testimony of a single eyewitness. He presented the defenses of alibi and misidentification. Although defense counsel called one witness to advance this defensive theory, counsel failed to call other witnesses who could have cast doubt on the complainant's identification and establish an alibi. The Court of Criminal Appeals found counsel deficient and reversed.

In *Shelton,* 841 S.W.2d 526, the defendant was charged with sexual assault of a child. His initial conviction was reversed and he was tried a second time. At retrial, the defendant's attorney failed to call as an alibi witness the defendant's great-niece, who had testified at the first trial, and whose testimony would have directly contradicted the complainant. *Ibid.* It was established the niece would have been available to testify in the second trial, but the defense attorney never contacted her. *Id.* at 527. In strong language, the Fort Worth Court of Appeals held counsel was ineffective and reversed the conviction:

> When counsel neglected to present available testimony in support of Shelton's alibi defense, he failed in his professional duty to his client. *See Ex parte Ybarra,*

629 S.W.2d 943, 948 (Tex.Crim.App. 1982). The attorney's failure to advance the one defense apparently available to Shelton clearly made his assistance ineffective, if not incompetent. *See Ex parte Duffy,* 607 S.W.2d 507, 517 (Tex. Crim.App.1980).

*Ibid.*

Similarly, in *Everage,* 893 S.W.2d 219, a theft prosecution, the complainant testified at trial that Everage, accompanied by another individual, Marcus Jenkins, filled out a credit application in the name of a third person, and then purchased a television in the name of the third person. *Id.* at 220. After the State rested, Everage's counsel requested a recess in order to call his witnesses, Jenkins and Kimberly Mayfield, a friend who allegedly saw Jenkins sign the credit application. The trial court denied the requested recess and ordered counsel to call witnesses. When counsel stated, "We don't have any witnesses," the trial court noted, "Both sides rest." *Id.* at 221. At the punishment phase, Mayfield testified that she accompanied Everage to the Circuit City where they met Jenkins. While in the store, Mayfield observed Jenkins, not Everage, fill out the credit application and did not see him sign the name of the third party. *Id.* at 222.

The First Court of Appeals held counsel was ineffective for failing to secure Mayfield's presence at the guilt phase of trial. The court found Mayfield's testimony would have tended to show that Jenkins, rather than Everage, was guilty of theft. Further, Mayfield's testimony would have corroborated testimony by the complainant in a pretrial hearing which indicated that Jenkins, rather than Everge, was the primary actor. The court stated:

> Because counsel failed to call witnesses, the jury did not hear Mayfield's testimony that Jenkins alone committed the theft. Because counsel failed to obtain pretrial testimony or rebuttal witnesses, the jury did not hear [the complainant's] prior testimony that Jenkins alone committed the theft. If they had heard this testimony, the jury may have acquitted appellant, under either theory of guilt. In fact, with no evidence that appellant knew of Jenkins' actions, he would have been entitled to acquittal as a matter of law.

*Id.* at 224.

Finally, in *Thomas,* 768 S.W.2d 335, this court held the trial court did not err in granting a motion for new trial based on ineffective assistance of counsel where the record showed the defensive theory was not fully advanced due to trial counsel's failure to interview and call certain witnesses. *Id.* at 337.

At the motion for new trial hearing, trial counsel testified he was aware of Hearn and had spoken with her at an apartment complex the weekend before trial. Counsel stated Hearn's testimony would have benefitted appellant because it would have corroborated Ava Germany's testimony in support of appellant's alibi/misidentification defense. Although he believed Hearn's testimony was important, trial counsel did not issue a subpoena to secure her presence at trial. Instead, counsel made arrangements for Hearn, Germany, and appellant's mother to meet trial counsel at a certain location and then the four would proceed to trial. When Hearn did not appear at the appointed time, Germany and appellant's mother informed counsel that Hearn was at the Jack In The Box restaurant. However, counsel did not inform the trial court of Hearn's nonappearance, request a continuance, or issue a subpoena to secure her presence. Therefore, consistent with the authority cited above, I would hold that despite Hearn's promise to appear, counsel failed to exercise due diligence by seeking compulsory

process for Hearn whom counsel deemed an important witness. *See Drew,* 743 S.W.2d at 207 (counsel must exercise due diligence in securing the testimony of prospective witnesses through the issuance of a subpoena); *Rodriguez,* 21 S.W.3d at 566 ("Failure to take the necessary steps to secure attendance of a key witness demonstrates a lack of reasonable diligence.").

### C.  Strategy.

Under the first prong of *Strickland,* the remaining question is whether this lack of diligence was the result of a strategic decision on the part of trial counsel. An attorney's strategic decision in failing to call a witness will be reversed only if there was no plausible basis for failing to call the witness to the stand. *See Velasquez v. State,* 941 S.W.2d 303, 310 (Tex.App.—Corpus Christi 1997, pet. ref'd)(citing *Brown v. State,* 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd)). Further, the failure to call a witness may support an ineffective assistance of counsel claim only if it is shown the witness was available and the defendant would have benefitted from the testimony. *See King v. State,* 649 S.W.2d 42, 44 (Tex. Crim.App.1983).

The Court of Criminal Appeals considered a similar situation in *Ex parte Varelas,* 45 S.W.3d 627 (Tex.Crim.App.2001), where the defendant was convicted of capital murder and raised a claim of ineffective assistance of counsel on direct appeal. The Court of Criminal Appeals affirmed the conviction and the defendant later pursued the ineffective assistance via habeas corpus. The issue was whether trial counsel was deficient in failing to request a jury instruction on a defensive issue consistent with the defendant's theory of the case. Trial counsel gave uncontradicted testimony by affidavit that the failure to request the jury instruction was not the

product of reasoned trial strategy. *Id.* at 632 n. 4. This affidavit permitted the Court of Criminal Appeals to determine the failure to request the instruction was not the product of trial strategy.

The record in the instant case, like that in *Varelas,* contains an admission by trial counsel that the complained of conduct was not strategic. This is self evident from trial counsel's letter to appellate counsel informing her about Hearn, and trial counsel's testimony at the motion for new trial hearing admitting he had "dropped the ball" in not securing Hearn's presence at trial. Consistent with *Varelas,* I cannot attribute to strategy deficient conduct that counsel admits was not pursued for strategic purposes. Therefore, I would hold the failure to secure Hearn's presence was not strategic.

### D.  Conclusion Of *Strickland's* First Prong Analysis.

As noted earlier, trial counsel testified he was unable to locate the two individuals who were with appellant and Hearn at the time of the robbery. Therefore, Hearn was one of only two witnesses who could have supported appellant's misidentification/alibi defense. Although he was clearly aware of the importance of Hearn's testimony, counsel failed to subpoena Hearn. And when counsel learned on the day of her proposed testimony that Hearn had failed to appear, counsel made no attempt to secure Hearn's presence at trial. The evidence is uncontradicted that Hearn was both available and that her testimony would have benefitted appellant. *See King,* 649 S.W.2d at 44. When trial counsel learned that Hearn would not voluntarily appear, he knew where Hearn lived and where she worked. Moreover, trial counsel's own testimony clearly establishes that there was no plausible basis for failing to call Hearn as a witness. *See Velasquez,*

941 S.W.2d at 310. Accordingly, I would hold trial counsel's failure to secure Hearn's presence at trial and consequent failure to present her testimony in support of appellant's misidentification/alibi defense fell below objective standards of professional conduct. *See Butler*, 716 S.W.2d at 48; *Shelton*, 841 S.W.2d at 526; *Everage*, 893 S.W.2d at 219; and *Thomas*, 768 S.W.2d at 335. The first prong of *Strickland* has been established.

### E. The Second Prong of *Strickland*

The Supreme Court has explained that the "reasonable probability" standard under the second prong is not an "outcome-determinative" test: that is, a defendant need not show that it is more probable than not that the jury would have arrived at a different verdict had the errors not occurred. *See Strickland*, 466 U.S. at 693, 104 S.Ct. at 2068; *Snow v. State*, 697 S.W.2d 663, 668 (Tex.App.—Houston [1st Dist].1985) pet. dism'd 794 S.W.2d 371 (Tex.Crim.App.1987) ("A probability may be reasonable even though it does not constitute a preponderance of the evidence."). *See also, Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir.1990) ("reasonable probability" standard is lower than "preponderance of evidence" standard); and, *Nealy v. Cabana*, 764 F.2d 1173, 1178–1179 (5th Cir.1985) (The Supreme Court found the "outcome determinative" standard was too heavy a burden on defendants and that its use was not appropriate. Instead, "the question is whether there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt."). Thus, a "reasonable probability" is merely one that is sufficient to undermine confidence in the outcome of the proceeding. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Butler*, 716 S.W.2d at 54. *See also Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *Young v. State*, 991 S.W.2d 835, 837 (Tex. Crim.App.1999) (Second part of the *Strickland* test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.") (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.). While advising that the harm prong of *Strickland* is not an outcome determinative test, the Supreme Court nevertheless observed that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 466 U.S. at 696, 104 S.Ct. at 2069.

The State's case rested upon the soundness of the complainant's identification of appellant. An objective review of the complainant's testimony raises serious questions about that identification. The complainant, thirteen years of age, had seen appellant around the apartment complex on approximately six occasions, but had never spoken with him. According to the complainant, when the two robbers suddenly burst into the apartment, their faces were covered with t-shirts pulled over their heads, exposing only their eyes. The complainant had only a couple of seconds to see the robber who was wearing a black t-shirt before being pushed to the ground and dragged to the bathroom. The lighting in the apartment was dim, consisting only of one dining room light and light from the television set. Kenneth Driver, who was also present at the time of the robbery, was unable to identify the robbers other than their being two black males.

Appellant's alibi/misidentification defense was presented solely through his girlfriend who testified that shortly before the offense, she, appellant, and another friend were talking outside in the common area, approximately 500 feet from the complainant's apartment. Appellant was wearing a white t-shirt that evening. Shortly before the offense, Germany went to the complainant's apartment to check up on her, and after determining that she was fine, went to speak with a friend standing by a trash dumpster in the parking lot. Germany had a view of the apartment from her location, and while speaking with her friend, she observed two black males enter the complainant's apartment. Germany testified that neither individual was appellant. Germany then returned to appellant who was now even farther from the complainant's apartment than before. Nothing appeared out of the ordinary. Germany later learned of the robbery and both she and appellant went to see what had occurred.

On cross-examination, the State sought to establish Germany's bias in favor of the defendant, and that she was incorrect regarding the date on which she was providing an alibi for appellant. The State questioned Germany whether the robbery occurred on July 28th or 29th, attempting to portray the events to which Germany testified as having happened on a day other than the day of the robbery. During its closing argument, the State attacked Germany's credibility resulting from her relationship with appellant and the accuracy of her memory of the date on which she was with appellant.[8]

Following this argument, the jury deliberated for several hours and even indicated that it was hopelessly deadlocked before being ordered to continue deliberating and ultimately reaching its verdict. *See* n. 2, *supra.*

The harm from failing to present corroboration evidence to the sole witness establishing appellant's misidentification/alibi defense is self evident. Germany's testimony was irreconcilable with the complainant's testimony. Therefore, in order to convict appellant, the jury necessarily had to disbelieve Germany. Thus, the instant case boiled down to a classic "swearing match" between the complainant and Germany. Counsel's failure to secure testimony from a neutral witness resulted in the jury being forced to weigh the credibility of the complainant against Germany who was arguably biased in favor of appellant.

The testimony of the complainant, Tracie, and Germany is undisputed that Hearn was present on the night of the robbery. Her testimony could have established appellant's presence at a location more than 500 feet away from the complainant's apartment when the robbery occurred. Hearn could have corroborated Germany's account of seeing two men enter the complainant's apartment. And Hearn could have established the complainant's emotional state after the robbery. The corroborative testimony from such a disinterested witness would have had the two-fold effect of independently establishing appellant's misidentification/alibi defense, as

---

8. The State contends this argument "neutralized any probative value Germany's alibi testimony could have had by establishing that what Germany witnessed did not even occur the evening of the robbery." It is clear that the complainant was robbed only once. It is equally clear the robbery occurred on the night Germany saw two men enter the complainant's apartment and subsequently went to console the complainant following that lone robbery. Therefore, the State's contention that its closing argument neutralized any probative value of Germany's testimony actually bolsters the proposition that Germany's testimony needed the corroboration which Hearn could have provided.

well as supporting Germany's credibility. And we know from the affidavits that at least three jurors would not have voted to convict had trial counsel presented additional testimony supporting appellant's defenses of alibi and misidentification

Accordingly, I would hold trial counsel's deficient performance in failing to secure Hearn's presence at trial and the failure to present her testimony in support of appellant's misidentification/alibi defense is sufficient to undermine our confidence in the verdict, which is weakly supported by the record. The second prong of *Strickland* has been established.

## IV.  Conclusion

The majority violates rule 41.2(c) by granting rehearing *en banc* in the instant case. It then proceeds to ignore all of the evidence from appellant's trial, and uses that insufficient factual basis to justify providing no legal analysis of the first point of error. The *en banc* majority opinion is, therefore, result oriented jurisprudence at its worst. Accordingly, I dissent.

## Appendix A

RICHARD H. EDELMAN, Justice, dissenting.

The majority opinion reverses appellant's conviction due to the ineffective assistance of his trial counsel in failing to subpoena Hearn to testify on appellant's behalf at trial. I disagree for two reasons. First, counsel's decision not to subpoena Hearn could have been based on a plausible trial strategy to avoid .disclosing Hearn's identity to the prosecution in the hope that the prosecution would remain unaware of her and thus be unprepared to effectively cross-examine or rebut her testimony at trial. [FN1] Like many trial strategies, this is a calculated risk that will not always prove successful. However,

taking risks is inherent in trying cases, and particularly in doing so effectively, and the element of risk does not render a plausible trial strategy ineffective assistance of counsel in the instances in which it happens to prove unsuccessful.

Secondly, as evidence to support its reversal, the majority opinion relies on testimony from appellant's trial counsel at the hearing on the motion for new trial. The majority opinion does not indicate that Hearn testified at that hearing, [FN2] or specify how, even according to appellant's trial counsel, Hearn was involved in the underlying facts or what testimony counsel expected Hearn to give. Without such rudimentary information, no basis exists to conclude that Hearn's testimony would have corroborated the alibi/misidentification testimony of appellant's girlfriend or had any other beneficial effect.

Moreover, even if such information had been provided by appellant's trial counsel, I do not believe that the hearsay impressions of a lawyer can establish what an absent witness would have really testified if placed under oath and subjected to cross-examination. Therefore, without the actual testimony of Hearn at the hearing on appellant's motion for new trial, I would not reverse the conviction for ineffective assistance of trial counsel in failing to subpoena Hearn to testify at trial.

FN1. Indeed, in some instances, a particular witness's testimony might only be beneficial to the defense where the prosecution has had no opportunity to prepare a cross-examination or rebuttal. As the sole judge of the weight and credibility of the evidence, the trial court was within its discretion to disbelieve the testimony of trial counsel that he didn't know why he failed to subpoena Hearn.

FN2. Somehow, Hearn was so important a witness that the failure to subpoena her at trial was ineffective assistance, but was

not so important a witness as to warrant issuing a subpoena for her to testify at the hearing on the motion for new trial.

Panel consists of Justices Amidei and Edelman.